**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ASHLEY HICKS et al.,** | |
| *Plaintiffs,* | |
| **v.** | **Civil Action** |
| **T.L. CANNON CORP. ET AL.,** | **No. 13-cv-6455 (EAW)** |
| *Defendants.* | |


**PLAINTIFFS' MEMORANDUM OF LAW IN**
**SUPPORT OF THEIR MOTION FOR PARTIAL**
**SUMMARY JUDGMENT FOR THE CLASS**


**THOMAS & SOLOMON LLP**
*Attorneys for Class*
693 East Avenue
Rochester, New York 14607
(585) 272-0540


Of Counsel:    J. Nelson Thomas
               Michael J. Lingle
               Jessica L. Lukasiewicz

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ....................................................................................... 1

PROCEDURAL AND FACTUAL BACKGROUND ...................................................... 2

    *Pay Statements and Wage Notices* ............................................................................ 2

    *Willfulness* ................................................................................................................ 4

    *Damage Calculations* ............................................................................................... 8

    *Defendants are Employers* ....................................................................................... 8

ARGUMENT .................................................................................................................... 10

    I.     LEGAL STANDARD .................................................................................. 10

    II.    SUBCLASS A IS ENTITLED TO SUMMARY JUDGMENT ON THEIR
          PAY STATEMENT CLAIMS ..................................................................... 10

        A.  Subclass A is entitled to summary judgment as to defendants' liability
            on the Pay Statement Claims ...................................................................... 10

    III.   SUBCLASS B IS ENTITLED TO SUMMARY JUDGMENT ON THE
          WAGE NOTICE CLAIMS .......................................................................... 14

        A.  Subclass B is entitled to summary judgment as to defendants' liability on
            the wage notice claims ............................................................................... 14

    IV.   THE CLASS MEMBERS ARE ENTITLED TO LIQUIDATED
          DAMAGES ................................................................................................... 19

    V.    THE CORPORATE DEFENDANTS ARE LIABLE AS THE CLASS
          MEMBERS' EMPLOYER .......................................................................... 21

        A.  The defendants are liable as the class members' single employer ............. 22

           1.  The defendants exercised centralized control over their stores' labor
               relations ................................................................................................ 22

           2.  The defendants have interrelated operations, common management,
               common ownership, and common financial control ............................. 23

         B.  The corporate defendants are alternatively liable as joint employers ...... 26

           1.  The *Carter* factors demonstrate the defendants' joint and several
               liability ................................................................................................ 27

           2.  The *Zheng* factors demonstrate the defendants' joint and several
               liability ................................................................................................ 29

**VI.    THE INDIVIDUAL DEFENDANTS ARE LIABLE AS THE CLASS MEMBERS' EMPLOYER** ...............................................................29

**VII.   LANGUAGE FOR THE JUDGMENT REQUIRED IN ORDER UNDER THE LABOR LAW** ...........................................................................35

**CONCLUSION** ........................................................................................................35

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ........................................................................................ 10

*Arculeo v. On-Site Sales & Mktg., LLC*,
   425 F.3d 193 (2d Cir. 2005)......................................................................... 21, 22

*Barfield v. N.Y.C. Health and Hosps. Corp.*,
   537 F.3d 132, 142 (2d Cir. 2008)...................................................................... 30

*Brown v. Daikin America, Inc.*,
   756 F.3d 219 (2d Cir. 2014)............................................................................... 22

*Carter v. Duchess Cmty. Coll.*,
   735 F.2d 8 (2d Cir. 1984).................................................................................. 27

*Chen v. TYT East Corp.*,
   No. 10-cv-5288, 2012 WL 5871617 (S.D.N.Y. Sept. 10, 2013).......................... 27

*Clinton's Ditch Cooperative Co. NLRB*,
   778 F.2d 132 (2d Cir. 1985).............................................................................. 22

*Cook v. Arrowsmith Shelbourne, Inc.*,
   69 F.3d 1235 (2d Cir. 1995).............................................................................. 22

*E.E.O.C. v. Everdry Mktg. & Mgmt., Inc.*,
   No. 01-CV-6329CJS, 2005 WL 231056 (W.D.N.Y. Jan. 31, 2005)..................... 23

*Harris v. New York Times*,
   No. 90-cv-5235 (CSH), 1993 WL 42773 (S.D.N.Y. Feb. 11, 1993) .................... 24

*Irizarry v. Castimatidis*,
   722 F.3d 99 (2d Cir. 2013).......................................................................... 29, 30

*Karic v. Major Automotive Cos.*,
   992 F.Supp.2d 196 (E.D.N.Y. 2014).................................................................. 19

*Kull v. DAvidoff of Geneva (N.Y.)*,
   No. 01-cv-4831(LMM), 2004 WL 1418088 (S.D.N.Y. June 23, 2004) ................ 23

*Murray v. Miner*,
   74 F.3d 402 (2d Cir. 1996)................................................................................ 22

*In re Nassau Cnty. Strip Search Cases*,
   461 F.3d 219 (2d Cir. 2006).............................................................................. 13

*Padilla v. Manlapaz*,
   643 F.Supp.2d 302 (E.D.N.Y. 2009)................................................................. 19

*Regan v. In the Heat of the Nite, Inc.*,
   No. 93 CIV. 862 (KMW), 1995 WL 413249 (S.D.N.Y. July 12, 1995)................. 25

*In re Visa Check/MasterMoney Antitrust Litig.*,
   280 F.3d 124 (2d Cir. 2001).............................................................................. 13

*Zheng v. Liberty Apparel Co. Inc.*,
  355 F.3d 61 (2d Cir. 2003) .......................................................................................... 22, 27, 30

**Statutes**

N.Y. Lab. Law § 663 .......................................................................................................... 19, 35

**Rules**

Fed. R. Civ. P. 56(a) .............................................................................................................. 10
N.Y.C.P.L.R. §§ 5001 ............................................................................................................ 13
N.Y.C.P.L.R. §§ 5004 ............................................................................................................ 13

**Regulations**

12 N.Y.C.R.R. § 1.3 ............................................................................................................... 15
12 N.Y.C.R.R. § 137-1.5 ....................................................................................................... 11
12 N.Y.C.R.R. § 137-2.2 ................................................................................................... 10, 11
12 N.Y.C.R.R. § 146-2.2 .......................................................................................... 3, 6, 15, 16
12 N.Y.C.R.R. § 146-2.3 ................................................................................................... 10, 11
12 N.Y.C.R.R. § 2.2 ............................................................................................................... 15

## PRELIMINARY STATEMENT

The class members move for summary judgment on both the Wage Notice Claim and the Pay Statement Claim.

This Court has already granted summary judgment on class member Kristin Raymond's Wage Notice Claim because no reasonable jury could conclude that the defendants complied with the laws and regulations requiring employers to provide certain information on the wage notice that they are required to provide to employees as a pre-requisite for being able to take advantage of the tip credit provisions. After granting summary judgment for Kristin Raymond, the Court granted plaintiffs' motion for class certification. The Court also denied the defendants' motion for reconsideration. Consistent with the Court's conclusion in granting class certification, discovery has confirmed that the wage notices provided to all other class members were not different in any material way from the wage notices that they provided to Plaintiff Raymond. Plaintiffs therefore now move for summary judgment for the class as to the wage notice claim.

As to the Pay Statement Claim, at an early stage in the case, the Court denied the parties' cross-motions for summary judgment. Since that time, discovery has shown that there is no genuine dispute that the paystubs that defendants provided do not list the tip credit or tip allowance as an allowance or credit claimed from the minimum wage. Therefore, because the defendants did not list the tip credit on the paystubs, they did not qualify to take advantage of the tip credit provisions and the class is entitled to judgment as a matter of law. Discovery has also confirmed this Court's holding, in granting class certification, and in denying the defendants' motion for reconsideration, that the paystub claims were common and typical across the class. Plaintiffs therefore move for summary judgment for the class as to the Pay Statement claim.

## PROCEDURAL AND FACTUAL BACKGROUND

Because this Court has ruled extensively on the issues in this motion, a lengthy procedural and factual discussion is not needed. *See* Doc. No. 205; Doc. No. 224.

### *Pay Statements and Wage Notices*

Turing first to the Pay Statement Claim, the defendants have stipulated that their paystubs were uniform for all class members from September 24, 2006 (start of the statute of limitations) until defendants changed their paystubs beginning on July 17, 2015. *See* Plaintiffs' Statement of Material Facts ("Pls.' Statement") at ¶ 1; Appendix to Pls.' Statement ("Appx. Ex.") A at ¶¶ 1-4, Ex. A; C. The paystub shows no tip credit at all as required by the regulation. Pls.' Statement ¶ 2; Appx. Exs. A, Ex. A; B-2. Furthermore, the paystubs reflect (incorrectly) that the class members wage rate was $5.00 an hour when in fact the regulations required that they show employees they were being paid the minimum wage of $7.25 an hour (with $2.25 an hour being made up by the tip credit). Docket No. 205 at 23; *see also* Pls.' Statement ¶ 3; Appx. Exs. A, at Ex. A; B at 190-91, 93. Even defendants admit that the paystubs reflected the wrong rate of pay. Pls.' Statement ¶ 4; Appx. Ex. B at 190-91, 93.  As this Court has already held, because the pay statements did not show employees their actual minimum wage less the tip credit allowance, "the pay statements at issue did not provide the requisite notice to the employees that Defendants were taking a tip for credits against the minimum wage." Doc. No. 205 at 23, 24-25.

Starting on July 17, 2015 defendants included language on the pay statements stating, "Hospitality ind: food serv wrkers-tip cred up to $3.75hr…taken toward $8.75hr min wage." *See* Pls.' Statement ¶ 5; Appx. Ex. C. Defendants only included this for class members working in the TLC West division at that time, which roughly includes Buffalo, Rochester, Syracuse, and the Finger Lakes. Pls.' Statement ¶ 6; Appx. Ex. D at 264:6-10. The defendants still refused to

put the language in for class members working in the TLC Central division (which roughly includes the Southern Tier, Mohawk Valley, Albany and the Hudson Valley) until March 15, 2016. Pls.' Statement ¶ 7; Appx. Ex. D at 264:4-5; C.

Regarding the wage notice, on January 1, 2011 the Hospitality Wage Order took effect requiring each employee be informed in writing of: (1) their hourly rate of pay (which was to be at least the minimum wage); (2) overtime rate of pay (which must be at least time and-half the minimum wage); (3) if a tip credit was used to pay up to the minimum wage, the amount of the tip credit; and (4) that extra pay was required to bring the employee up to the minimum wage if the tip for the tip credit was insufficient. Doc. No. 205 at 26-31; 12 N.Y.C.R.R. § 146-2.2.

As this Court ruled, the defendants provided an improper Wage Notice to employees after the effective date of the regulation. Decision and Order, Doc. No. 205 at 26-31. Defendants have stipulated that they failed to provide the required Wage Notice to all current employees from January 1, 2011 (when the Hospitality Wage Order requiring the tip credit wage notice took effect) until December 31, 2011, excluding those hired beginning June 1, 2011. Pls.' Statement ¶ 8; Appx. Ex. A, at ¶¶ 5-6, Exs. B-C. For employees hired between June 1, 2011 and June 24, 2013, they were provided a form that was similar to the one provided to Ms. Raymond. Pls.' Statement ¶ 9; Appx. Ex. A, at ¶ 6, Ex. C. This notice to new employees stated that extra pay would be required if tips were insufficient, but falsely told employees that their wage was $5.00 an hour, not the minimum wage which at that time was $7.25 an hour. Pls.' Statement ¶ 10; Appx. Exs. A, at ¶ 6, Ex. C; B at 190-91, 193. Defendants were instead required to inform the employees that they were entitled to a minimum wage of $7.25 an hour, against which a tip credit could be taken. "[T]he plain language of the statute makes it clear that food service workers are entitled to the standard minimum wage….Defendants assume that Plaintiffs were not

'entitled' to the standard minimum wage because they received tips. The plain language of § 198 does not lead to this conclusion." Decision and Order, Doc. No. 205 at 30. It also incorrectly told employees their overtime rate was the minimum wage, not time and one-half the minimum wage. Pls.' Statement ¶ 11; Appx. Exs. B at 234-236; B-5.

Beginning January 1, 2012 and through June 24, 2013, between January 1 and February 1 of each year, defendants have stipulated that employees received a different wage notice.  Pls.' Statement ¶ 12; Appx. Ex. A ¶ 7, Ex. D. This form was based off of the New York State Department of Labor form that was provided to employers as a fill-in-the-blank template to make it simple to comply with the regulation. Pls.' Statement ¶ 14; Appx. Ex. E. However, in promulgating the form, defendants deliberately removed the sections providing employees the tip credit notices—even though the notice was going to tip credit employees. Pls.' Statement ¶ 15; Appx. Exs. A, at ¶ 7, Ex. D; B at 234:2-10; B-6; B-7. Therefore, much like the form used for Ms. Raymond—which this Court has already found to be non-compliant as a matter of law—this form also is non-compliant as it eliminates all mention of the tip credit. Decision and Order, Doc. No. 205 at 30.  Judge Payson indicated the same in her ruling on the motion to compel in this action. Docket No. 260 at 7, n.2 ("The same reasoning that led Judge Wolford to conclude that the January 2011 Notice was deficient…would appear to apply equally to the January 2012 Notice and foreclose any argument that it was legally sufficient."). Defendants have stipulated this form was used for all current employees from January 1, 2012 until June 24, 2013. Pls' Statement ¶ 16; Appx. Exs. A at ¶ 7, Ex. D. New hires starting after June 24, 2013 received the correct Department of Labor form. Pls.' Statement ¶ 17; Appx. Exs. A, at ¶¶ 8-9, Exs. E-F.

*Willfulness*

The defendants certainly lived up to their corporate name, T.L. Cannon, which stood for

"two loose cannons." *See* Pls.' Statement ¶ 18; Appx. Ex. F at 7:22-8:3. They claimed to understand how important it was to comply with New York's wage-and-hour regulations. Pls.' Statement ¶ 19; Appx. Ex. B at 176:16-20. They employed approximately 3,800 employees at any one time and they were one of the largest employers in the country, easily within the top 1% largest employers in the nation. Pls.' Statement ¶ 20; Appx. Exs. B-3; B at 179:6-180:15. The defendants also employ a Head of Human Resources whose job it is to be familiar with and make sure the defendants comply with New York State's wage-and-hour regulations. Pls.' Statement ¶ 21; Appx. Ex. B at 175:17-176:15, 182:2-3, 194:7-11.

The defendants' head of Human Resources was familiar with the relevant wage-and-hour regulations and was aware of them even before they went into effect. *See* Pls.' Statement ¶ 22; Ex. B at 175:6-176:9, 211:10-20. The defendants also knew it was helpful to retain wage-and-hour counsel and to follow counsel's advice to be sure they complied. Pls.' Statement ¶ 23; Appx. Ex. B at 177:8-19. The company had more than enough resources to take whatever steps were necessary to understand wage-and-hour laws and there was never a time the Head of Human Resources did not have corporate approval to consult with counsel. Pls.' Statement ¶ 24; Appx. Ex. B at 178:15-179:3. Nonetheless, human resources was given a backseat at the company. Although defendants' president inquired to make sure all departments that reported to him were complying with their requirements, he did not do so for human resources. Pls.' Statement ¶ 25; Appx. Ex. G at 40:6-45:22. For that department alone, he did not bother to see if they were complying with the law. Pls.' Statement ¶ 26; Appx. Ex. G at 40:6-45:22.

This attitude permeates the claims in this litigation. As to the pay statements, even though defendants knew they were responsible for complying with the law, and understood the relevant regulations, they took no steps to make sure the pay statements were compliant, other than

engaging an outside payroll processer. Pls.' Statement at ¶ 27-28; Appx. Ex. B at 197:3-206:9; D at 250:18-251:2, 256:8-16, 259:20-261:8; 273:23-274:6; 277:18-278:5. The contracts with the payroll processor, however, have no provisions where defendants contracted for the processer to provide compliant paystubs. *See* Pls.' Statement ¶ 29; Apx. Exs. D-1-D-5. They do the reverse: "Client acknowledges and agrees that Paychex is not rendering legal, tax accounting, or investment advice in connection with the services to be performed." Pls.' Statement ¶ 30; Appx. Exs. D-1-D-5; D at 262:21-263:3. Although defendants claim they believed they were supplying compliant paystubs solely based on the contracts, they knew that under the contract the payroll processor was **not** ensuring that the paystubs were legally compliant. Pls.' Statement ¶ 31; Appx. Ex. D at 262:21-263:3. Defendants made no efforts to otherwise ensure compliance with the regulations. Pls.' Statement ¶ 32; Appx. Exs. D at 250:18-251:2, 256:8-16; B at 197:3-206:9. In addition, even after this Court's August 5, 2014 decision which rejected defendants' arguments about the content of the pay statements, defendants did not change their pay statements to conform to the Court's ruling until years later. Pls.' Statement ¶ 33; Appx. Exs. A; C.

As to the wage notice requirements, the defendants knew that New York State regulations required them to provide employees with a document informing them of the tip credit and have the employees sign it. Pls.' Statement ¶ 34; Appx. Ex. H at 54:4-14. First, the regulations set forth the requirements for the wage notice. N.Y. Comp. Codes R. & Regs. tit. 12, § 146-2.2. Additionally, the New York State Department of Labor issued a "fill in the blank" template for employers to issue to employees. Pls.' Statement ¶ 35; Appx. Ex. E.

After the Hospitality Wage Order took effect in January of 2011 requiring tip credit and related information to be signed by employees, the defendants still issued to employees the non-compliant Wage Notice, even though the defendants knew about the new regulation and knew

the regulation required that the employees be given more information. Pls.' Statement ¶ 36; Appx. Ex. B at 211:23-214:2; B-4. Although the defendants issued a new (and also non-compliant) Wage Notice to new hires after June 1, 2011, the defendants made no effort to provide current employees with the correct Wage Notice. The defendants were able to provide no reason for this failure. Pls.' Statement ¶ 37; Appx. Ex. B-5; B at 213:15-217:25.

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████ Despite the advice from counsel, defendants did not issue the required notice until several years later. Pls. Statement ¶ 44; Appx. Exs. A; C.

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ Pls.'

Statement ¶ 46; Appx. Ex. B-7. However, despite being warned by two separate counsel not to do so, defendants decided for the 2012 forms that they would **delete** (again) the required information on the tip credit even though the form was going to tipped employees. *See* Pls.' Statement ¶ 47; Appx. Ex. B-8. The defendants did not correct their error for two more years even though their counsel had told them they needed to. Pls.' Statement ¶ 48; Appx. Exs. A, C.

*Damage Calculations*

Attached to the Affirmation of Dr. Audrius Girnius are the damages models for Subclass A and Subclass B. Pls.' Statement ¶¶ 49-77; Appx. Exs. K, Exs. A-F(3).

*Defendants are Employers*

The corporate and individual defendants are all plaintiffs' employers. There is no dispute the LLC entities are plaintiffs' employers, Pls.' Statement ¶¶ 78-79; Appx. Ex. H at 15:22-25; 16:12-17:2; I at 19:24-20:22; 22:20-23:10, and they operate as a single employer under the joint control of the other corporate defendants, T.L. Cannon Corp. and T.L. Cannon Management Corp. The corporate defendants refer to themselves collectively as the "T.L. Cannon Companies." Pls.' Statement ¶ 80; Appx. Ex. I-I. They own and operate the Applebee's locations where the plaintiffs worked. Pls.' Statement ¶ 80; Appx. Ex. I-I. The corporate defendants exercised centralized control over labor relations through T.L. Cannon Management Corp., which was responsible for recruiting, employee relations, policies and procedures, including pay policies and procedures and best practices to be followed at the locations where the plaintiffs worked. *See, e.g.*, Pls.' Statement ¶¶ 81-87; Appx. Exs. B at 155:9-25, 158:3-18, 165:7-21; F at 16:15-17:4; H at 17:3-21; I at 76:11-78:2; G at 110:17-111:18.

The corporate defendants also have interrelated operations, as T.L. Cannon Management Corp. centrally manages payroll, accounts payable and financial processing, and public relations,

customer service, construction, marketing, human resources, benefits, and purchasing for all T.L. Cannon restaurants. Pls.' Statement ¶ 87; Appx. Ex. L ¶¶ 31, 33. T.L. Cannon Management Corp. formulates policies and procedures for the LLCs, and handles financials for the restaurants. Pls.' Statement ¶¶ 88-89; Appx. Exs. F at 16:15-17:4; G at 110:17-111:17; I at 21:20-22, 23:16-20, 24:3-10, 76:11-78:2. The tip credit policy forming the basis of this action resulted from centralized decisions and policies made by T.L. Cannon Management Corp. Pls.' Statement ¶ 91; Appx. Exs. H at 42:19-21, 103:22-104:15, 116:24-25, 132:20-134:5, 131:8-24; H-1.

The three individual defendants are also employers because of their operational control over the business. David J. Stein is a co-founder and shareholder of the company who had oversight over the companies' affairs, made decisions about profit distributions and attended senior staff meetings. Pls.' Statement ¶¶ 110-113; Appx. Exs. F at 16:2-4; Ex. I at 27:8-11, 31:21-25, 39:24-40:7, 48:15-22, 56:11-13, 58:19-59:7. Matthew J. Fairbairn is a co-founder, president and CEO who is actively involved in the restaurants' operations. Pls.' Statement ¶¶ 118-119, 123; Appx. Exs. F at 7:18-21:25, 22:5-26; I at 15:20-16:7, 28:8-11, 39:24-40:9. Fairbairn visited the restaurants, has firing and firing authority over employees, sets business goals for the company and has authority to direct changes to employment policies affecting the plaintiffs. Pls.' Statement ¶¶ 123, 126, 129, 132; Appx. Exs. F at 19:22-20:3, 21:11-25, 22:5-26; G at 14:18-16:2; H at 24:20-21, 27:4-5. Finally, John A. Perry was a president and shareholder who was actively involved in the day-to-day operations of the business, including managing construction, IT and human resources. Pls.' Statement ¶¶ 133-135; Appx. Exs. G at 14:2-9, 65:21-66:6, 36:10-37:20, 52:6-20; G-3; H at 28:19-21. The Director of Human Resources, Susan Sabio, reported directly to Perry, and he monitored wage and hour compliance and was involved in approving company best practices. Pls.' Statement ¶¶ 136, 138, 141; Appx. Exs. B at 162:9-

169:20; F at 44:9-13; G at 18:7-37, 38:11-43:4, 43:10-17, 99:15-106:9. Perry also instructed managers on employee scheduling, had authority to hire, fire and discipline employees and visited the restaurants providing suggestions on how to run the restaurants. Pls.' Statement ¶¶ 137, 142, 143; Appx. Exs. G at 46:17-24, 50:5-51:16, 77:17-80:18; I at 80:12-81:16.

## ARGUMENT

### I.   LEGAL STANDARD.

Rule 56 allows a party to move for partial summary judgment on any claim or defense or only on certain parts of any claim or defense. Fed. R. Civ. P. 56(a). That Rule provides that "[t]he court **shall** grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added). A fact is material only if it affects the outcome of the litigation, and a dispute is genuine only if a reasonable jury could return a verdict in the non-movant's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### II.   SUBCLASS A IS ENTITLED TO SUMMARY JUDGMENT ON THEIR PAY STATEMENT CLAIMS.

#### A.   Subclass A is entitled to summary judgment as to defendants' liability on the Pay Statement Claims.

As this Court held in its August 5, 2014 decision, an employer cannot pay employees at tip credit rates unless it also follows the tip credit regulations' requirements to provide the required notices in an employee's pay statement. Doc. No. 205 at 24-25. Defendants had argued that the employer did not lose the tip credit because they failed to provide the required regulatory notice, but this Court rejected that argument.

In terms of the relevant regulations, the regulation addressed in the Court's Decision and Order was in effect until January 1, 2011. 12 N.Y.C.R.R. § 137-2.2 (repealed). After January 1, 2011 the regulation was re-numbered as 12 N.Y.C.R.R. § 146-2.3. The pre-2011 regulation

-10-

required employers to list the tip credit by defining the tip credits as an "allowance," and then requiring employers to list all "allowances" against the minimum wage in the paystub. 12 N.Y.C.R.R. § 137-1.5 (repealed); 12 N.Y.C.R.R. § 137-2.2 (repealed). The post-2011 regulation simply listed "tips" as an example of the "allowances" that needed to be listed in the paystub as being taken against minimum wages. 12 N.Y.C.R.R. § 146-2.3.

This Court held that the factual record was "insufficiently developed" at the time of the Decision and Order to grant summary judgment to the plaintiffs on their Pay Statement Claim. Doc. No. 205 at 26. More specifically, plaintiffs' motion relied heavily on the testimony of Susan Sabio, defendants' Director of Human Resources, in which she testified that defendants did not "furnish to employees a statement with every payment of wages showing the allowance [Defendants] were taking for the tip credit provision against the minimum wage." Doc. No. 205 at 23. This Court found Ms. Sabio's statement to be unclear since the statement could have been only referring to certain allowances (meals, lodgings, etc.) not being listed on the paystub, which were not at issue, or the statement could have been referring to the failure to list the tip credit allowance specifically, which was required by the regulation. Doc. No. 205 at 23.

Now that the parties have conducted additional discovery on the issue, there is no dispute that prior to July 17, 2015 for some of defendants' employees, and March 15, 2016 for all of the defendants' employees, that the pay statement did not show the tip credit being taken as required by the regulation. Pls.' Statement ¶¶ 5, 7; Appx. Exs. A, C. The defendants have stipulated that their paystubs were uniform for all class members from September 24, 2006 (start of the statute of limitations) until defendants changed their paystubs at the dates discussed below. Pls.' Statement ¶ 1; Appx. Exs. A, at ¶¶ 1-4; Exs. A, C. The paystub shows no tip credit at all as required by the regulation. Pls.' Statement ¶ 2; Appx. Ex. A at ¶¶ 1-4, Exhibit A; B-2.

Furthermore, the paystubs reflected (incorrectly) that the class members' wage rate was $5.00 an hour when in fact the regulations required that it show employees they were being paid the minimum wage of $7.25 an hour (with $2.25 an hour being made up by the tip credit). Decision and Order at 23; Pls.' Statement ¶ 10; Ex. B at 190-191; A, at Ex. C. Even the defendants admit that the paystubs reflected the wrong rate of pay. Pls' Statement ¶ 4; Appx. Ex. B at 190-91, 193.

Because the pay statements did not show employees their actual minimum wage less the tip credit allowance, "the pay statements at issue did not provide the requisite notice to the employees that Defendants were taking a tip for credits against the minimum wage." Decision and Order, Doc. No. 205 at 23. Therefore, the defendants improperly paid class members the lower tip credit rate during that time period. Doc. No. 205 at 24-25.

Long into this litigation the defendants finally changed their pay statements. Starting on July 17, 2015 the defendants included language on the pay statements stating, "Hospitality ind: food serv wrkers-tip cred up to $3.75hr…taken toward $8.75hr min wage." Pls.' Statement ¶ 5; Appx. Ex. C. Bizarrely, though, defendants only included this for class members working in the TLC West division at that time, which roughly includes Buffalo, Rochester, Syracuse, and the Finger Lakes. Pls.' Statement ¶ 6; Appx. Ex. D at 264:6-10. The defendants still did not add the language in for class members working in the TLC Central division (which roughly corresponds to the Southern Tier, Mohawk Valley, Albany and the Hudson Valley) until March 15, 2016. Pls.' Statement ¶ 7; Appx. Ex. D. at 264:2-5; C.

Therefore, class members who did not receive the requisite notice during this period are entitled to the differential between the lower tip credit rate they were improperly paid and the actual minimum wage. Doc. No. 205 at 24-25. The calculations of the amounts owed have been performed from defendants' payroll data and there is no dispute that Exhibit A(1) to the

Affirmation of Dr. Audrius Girnius, sworn on September 22, 2016 ("Girnius Aff.") sets forth the wage differential amounts for each class member for the period September 24, 2006 until December 31, 2011. Pls.' Statement ¶ 51; Appx. Ex. K, at ¶ 22, Exhibit A(1). Further, the class members are also entitled to liquidated damages. There is no dispute that Exhibits A(2) and A(3) to the Girnius Aff. set forth the amount of the liquidated damages. Pls.' Statement ¶ 52-53; Appx. Ex. K, at ¶ 23-24, Exhibits A(2) and A(3). These class members are also entitled to pre-judgment interest at the rate of 9%. N.Y.C.P.L.R. §§ 5001, 5004; Doc. No. 205 at 31.[1] There is no dispute that Exhibit A(4) to the Girnius Aff. sets forth the amount of pre-judgment interest for each class member for the above mentioned claims through December 31, 2016, an amount which can be re-calculated based on the date judgment is actually entered. Pls.' Statement ¶ 54; Appx. Ex. K, at ¶ 25, Exhibits A(4). The damages of each class member have been calculated separately based on the relevant dates and categories of employees. Since these differences only relate to damages calculations, there does not appear to be a need to create separate subclasses for each group. However, the Court has the authority to redefine the class if it believes that creating subclasses on the basis of damages calculations would increase judicial efficiency.[2]

Similarly there is no dispute that Exhibit B(1) to the Girnius Aff. sets forth the wage differential amounts for each class member in the TLC West division for the period January 1, 2011 until July 17, 2015. Pls.' Statement ¶ 56; Appx. Ex. K, at ¶ 27, Exhibits B(1). There is no dispute that Exhibits B(2) and B(3) to the Girnius Aff. set forth the amount of liquidated damages.  Pls.' Statement ¶ 57-58; Appx. Ex. K, at ¶ 27, 28, Exhibits B(2), B(3). There is no

---

[1]     For the reasons discussed below, class members are entitled to liquidated damages in each of the damage models attached to the Affirmation of Dr. Audrius Girnius. *See* Appx. Ex. K. Further, class members are also entitled to pre-judgment interest at a rate of 9%.

[2]     *See In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 141 (2d Cir. 2001), *superseded on other grounds* ("There are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action, including . . . . creating subclasses."); *In re Nassau Cnty. Strip Search Cases,* 461 F.3d 219, 231 (2d Cir. 2006).

dispute that Exhibit B(4) to the Girnius Aff. sets forth the amount of pre-judgment interest for each class member through December 31, 2016, an amount which can be re-calculated based on the date judgment is actually entered. Pls.' Statement ¶ 59; Appx. Ex. K, at ¶ 29, Exhibits B(4).

There is no dispute that Exhibit C(1) to the Girnius Aff. sets forth the wage differential amounts for each class member in the TLC Central division for the period January 1, 2011 until March 15, 2016. Pls.' Statement ¶ 61; Appx. Ex. K, at ¶ 31, Exhibit C(1). There is no dispute that Exhibits C(2) and C(3) to the Girnius Aff. set forth the amount of liquidated damages for the class members. Pls.' Statement ¶ 62-63; Appx. Ex. K, at ¶ 32-33, Exhibits C(2), C(3). There is no dispute that Exhibit C(4) to the Girnius Aff. sets forth the amount of pre-judgment interest for each class member through December 31, 2016, an amount which can be re-calculated based on the date judgment is actually entered. Pls.' Statement ¶ 62; Appx. Ex. K, at ¶ 34, Exhibits C(4).

The class therefore requests that judgment be entered in each member's favor against all defendants in the amounts set forth in the referenced exhibits.

## III.   SUBCLASS B IS ENTITLED TO SUMMARY JUDGMENT ON THE WAGE NOTICE CLAIMS.

### A.   Subclass B is entitled to summary judgment as to defendants' liability on the wage notice claims.

Although premised on different reasons, the claims of both Subclass A and B involve defendants' inability to use the tip credit. The recovery for Subclass A covers a longer period (approximately 2006 until approximately 2015, as discussed above) than those of Subclass B (approximately 2011 until approximately 2014, as discussed below). Because double recovery is not allowed, should the members of Subclass A fully recover their damages as outlined above, the claims of Subclass B discussed below are superfluous because those claims cover only a subset of Subclass A's recovery.

As this Court has already determined, an employer cannot take advantage of the tip credit

provisions only "if the employee has been notified of the tip credit as required in section 146-2.2 of this Part." 12 N.Y.C.R.R. § 1.3; Doc. No. 205 at 26. Among other things, section 146-2.2 requires that the employer provide a written wage notice that, among other things, (1) lists "the amount of tip credit, if any, to be taken from the basis minimum hourly rate," and (2) states "that extra pay is required if tips are insufficient to bring the employee up to the basic minimum hourly rate." 12 N.Y.C.R.R. § 2.2. Further, this Court also held that an employer is liable when the employer does not provide the written tip credit wage notification informing the employee, among other things, that the employer intends to take the tip credit, the amount of the tip credit that will be taken, and that extra pay is required if the tips are insufficient to bring the employee up to the state's minimum wage. Specifically, this Court ruled that defendants' standard notice that was provided to Kristin Raymond barred the defendants' use of the tip credit because none of these requirements were met in the notice. Doc. No. 205 at 30.

Defendants have stipulated that they provided this improper Wage Notice for all employees from January 1, 2011 (when the Hospitality Wage Order requiring the tip credit wage notice took effect) until December 31, 2011, excluding those hired after June 1, 2011. Pls.' Statement ¶ 8; Appx. Ex. A, at ¶¶ 5, 6, Exs. B and C. A slightly different version of the same notice was used for new hires in the period June 1, 2011 until June 24, 2013. Pls.' Statement ¶ 9; Appx. Ex. A, at ¶ 6, Ex. C. Therefore, class members who did not receive the requisite notice during this period are entitled to the differential between the lower tip credit rate they were improperly paid and the actual minimum wage. Decision and Order, Doc. No. 205 at 31-32. The calculations of the amounts owed have been performed from defendants' payroll data and there is no dispute that Exhibit D(1) to the Girnius Aff. sets forth the wage differential amounts for each class member for the period January 1, 2011 until December 31, 2011, excluding those

hired in the period June 1, 2011 until December 31, 2011. Pls.' Statement ¶ 66; Appx. Ex. K, at ¶ 36, Exhibit D(1). There is no dispute that Exhibits D(2) and D(3) to the Girnius Aff. set forth the amount of liquidated damages for class members in Exhibit D(1). Pls.' Statement ¶ 67-68; Appx. Ex. K, at ¶ 37-38, Exhibits D(1), D(2). There is no dispute that Exhibit D(4) to the Girnius Aff. sets forth the amount of pre-judgment interest for each class member for the above- mentioned claims through December 31, 2016, an amount which can be re-calculated based on the date judgment is actually entered. Pls.' Statement ¶ 69; Appx. Ex. K, at ¶ 39, Exhibits D(4).

Employees hired between June 1, 2011 and June 24, 2013 were provided a form similar to the one provided to Ms. Raymond. Pls.' Statement ¶ 9; Appx. Ex. A at ¶¶ 5, 7; Exhibit C.[3] Unlike that form, this notice did state that extra pay would be required if tips were insufficient, but falsely told employees that their wage was $5.00 an hour, not the minimum wage which at that time was $7.25 an hour. Pls.' Statement ¶ 3; Appx Exs. A, at Ex. C; B at 190-91, 193.

The defendants were instead required to inform the employees that they were entitled to a minimum wage of $7.25 an hour, against which a tip credit could be taken. The regulation is plain in this point requiring that the notice state "the amount of the tip credit, if any, to be taken from the basic minimum wage." 12 N.Y.C.R.R. §146-2.2. This Court explained this basic point. "[T]he plain language of the statute makes it clear that food service workers are entitled to the standard minimum wage . . . . Defendants assume that Plaintiffs were not 'entitled' to the standard minimum wage because they received tips. The plain language of § 198 does not lead to this conclusion." Doc. No. 205 at 30. That is the bedrock purpose of both the Pay Statement regulations and the Wage Notice regulations: to make sure employees are informed that they are entitled to the full minimum wage, not a substandard wage tip credit wage, and that the tip credit

---

[3]     Defendants have also stipulated that they provided another Wage Notice beginning January 1, 2012 through June 24, 2013 between January 1 and February 1. Pls' Statement ¶ 12; Appx. Ex. A at ¶ 7, Ex. D.

is actually just an allowance towards their actual minimum wage. Additionally, the form falsely told employees their overtime rate was the minimum wage, not time and one-half the minimum wage. Pls.' Statement ¶ 11; Appx. Ex. B at 234-236; B-5.

Because the wage form informed the employees exactly the opposite of what the regulations required—and in fact misled the employees on the point the regulations were deigned to clarify—the employees who received that wage form are entitled to summary judgment. Therefore, class members who did not receive the requisite notice during this period are entitled to the differential between the lower tip credit rate they were improperly paid and the actual minimum wage. Doc. No. 205 at 31-32. The calculations of the amounts owed have been performed from defendants' payroll data, and there is no dispute that Exhibit E(1) to the Girnius Aff. sets forth the wage differential amounts through December 31, 2011 for each class member hired or re-hired between June 1, 2011 and December 31, 2011; and February 1, 2012 through December 31, 2012 for each class member hired or re-hired between February 1, 2012 and December 31, 2012; and February 1, 2013 through June 24, 2013 for all class members hired or re-hired between February 1, 2013 and June 24, 2013. Pls.' Statement ¶ 71; Appx. Ex. K, at ¶ 41, Exhibit E(1). There is no dispute that Exhibit E(2) to the Girnius Aff. sets for the amount of liquidated damages at one-hundred percent. Pls.' Statement ¶ 72; Appx. Ex. K, at ¶ 42, Exhibit E(2). There is no dispute that Exhibit E(3) to the Girnius Aff. sets forth the amount of pre-judgment interest for each class member through December 31, 2016, an amount which can be re-calculated based on the date judgment is actually entered. Pls.' Statement ¶ 72; Appx. Ex. K, at ¶ 43, Exhibit E(3).

As noted above, starting on January 1, 2012 defendants provided a new form between January 1 and February 1 of each year. Pls.' Statement ¶ 12; Appx. Ex A, at ¶ 7, Exhibit D. This

form was based off of the New York State Department of Labor form that was provided to employers as a fill-in-the-blank template to make it simple to comply with the regulation. Pls.' Statement ¶ 14; Appx. Ex. E. However, in promulgating the form, the defendants deliberately removed the sections providing employees the tip credit notices—even though the notice was going to tip credit employees. Pls.' Statement ¶ 15; Appx. Ex. A at ¶ 7, Ex. D; B at 224:25-225:10; B-6; B-7. Therefore, much like the form used for Ms. Raymond—which this Court has already found to be non-compliant as a matter of law—this form also is non-compliant as it eliminates all mention of the tip credit. Judge Payson indicated the same in her ruling on the motion to compel in this action. Docket No. 260 at 7, n.2 ("The same reasoning that led Judge Wolford to conclude that the January 2011 Notice was deficient . . . . would appear to apply equally to the January 2012 Notice and foreclose any argument that it was legally sufficient.")

Defendants have stipulated this form was used for all employees from January 1, 2012 until June 24, 2013 between January 1 and February 1, of each year. Pls.' Statement ¶ 16; Appx. Ex. A at ¶ 7, at Ex. D. However, new hires starting after June 24, 2013 received the correct Department of Labor form. Pls.' Statement ¶ 17; Appx. Ex. A at ¶ 8, Ex. E. Therefore, class members who did not receive the requisite notice through June 24, 2013 are entitled to the differential between the lower tip credit rate they were improperly paid and the actual minimum wage. Decision and Order, Doc. No. 205 at 31-32. The calculations of the amounts owed have been performed from defendants' payroll data and there is no dispute that Exhibit F(1) to the Girnius Aff. sets forth the wage differential amounts for the period of time between January 1, 2012 and December 31, 2012 for each class member working between January 1, 2012 and February 1, 2012; and January 1, 2013 through June 24, 2013 for each class members working between January 1, 2013 and February 1, 2013. Pls.' Statement ¶ 75; Appx. Ex. K, at ¶ 45,

Exhibits F(1). There is no dispute that Exhibit F(2) to the Girnius Aff. sets forth the amount of liquidated damages for class members in Exhibit F(1) at a rate of one-hundred percent. Pls.' Statement ¶ 76; Appx. Ex. K, at ¶ 46, Exhibits F(2). There is no dispute that Exhibit F(3) to the Girnius Aff. sets forth the amount of pre-judgment interest for each class member through December 31, 2016, an amount which can be re-calculated based on the date judgment is actually entered. Pls.' Statement ¶ 77; Appx. Ex. K, at ¶ 47, Exhibit F(3).

The class therefore requests that judgment be entered in each class member's favor against all defendants in the amounts set forth in the referenced exhibits.

## IV.     THE CLASS MEMBERS ARE ENTITLED TO LIQUIDATED DAMAGES.

Since November 24, 2009, under the New York Labor Law, the good faith defense has been a defense on which the employer bears the burden. *See* N.Y. Lab. Law § 663(1). Lack of good faith is not an element of a plaintiff's claim. Rather, a prevailing employee is presumptively entitled to liquidated damages, and an employer can rebut this presumption only by proving, as an affirmative defense, that it had "a good faith basis to believe that its underpayment of wages was in compliance with the law . . . ." *Id.*

Before November 24, 2009, the standard was slightly different. Under that standard, the burden was on the employee to prove that the defendants' violation was "willful." "A violation of the New York Labor Law is willful where the employer knowingly, deliberately or voluntarily disregards its obligation to pay wages." *Padilla v. Manlapaz*, 643 F.Supp.2d 302, 313 (E.D.N.Y. 2009) (internal quotations and citations omitted). The court looks to whether the defendants engaged in a good faith effort to comply with the legal requirements. *Id.* "The plaintiff need not show malice or bad faith to establish willfulness." *Id.*; *see also Karic v. Major Automotive Cos.*, 992 F.Supp.2d 196, 203-03 (E.D.N.Y. 2014). Here, there is no dispute that the class members are entitled to liquidated damages under the older willfulness standard, and certainly under the

-19-

current standard by which they are presumptively entitled to liquidated damages.

As to the pay statement claim, the defendants candidly admit that they did **nothing** to ensure compliance with the law, except contract with a payroll processor where the processor was clear that it was providing no advice about whether the pay statement complied with the law. Pls.' Statement ¶¶ 28-31; Appx. Exs. B. at 197:3-206:9; D at 250:18-251:2, 256:8-16, 259:20-261:8, 273:23-274:6, 277:18-278:5, 262:21-263:3; D-1; D-2; D-3; D-4; D-5. Moreover, the defendants knew what the regulation required and knew their paystubs did not comply. Pls.' Statement ¶¶ 30, 31, 34, 38-47; Appx. Exs. D at 262:21-263:3; B at 224:25-225:24; B-6; B-7; B-8. Further, even after this Court in August of 2014 directly noted to defendants the numerous deficiencies in their arguments justifying their pay statement defendants simply ignored this Court's ruling and did nothing to correct their paystubs. *See* Appx. Exs. A; C. Such conduct by one of the largest employers in the country, with a dedicated Human Resources department, multiple employment attorneys, and no lack of resources to engage counsel, represents the height of willful misconduct. Pls.' Statement ¶ 20-21, 38, 45. Appx. Exs. B-3; B-6; B at 179:6-180:15, 175:17-176:15, 182:2-3, 194:7-11, 224:25-225:10.

The same is true for the Wage Notice claim. The defendants knew that New York State regulations required them to provide employees with a document informing them of the tip credit and have the employees sign it. Pls.' Statement ¶ 34; Appx. Ex. H at 54:4-14. First, the regulations set forth the requirements for the wage notice and the defendants knew and understood the regulation. Pls.' Statement ¶ 34; Appx. Ex. H at 54:4-14. Additionally, the New York State Department of Labor had issued a "fill in the blank" template for employers to issue to employees that complied with the regulations which the defendants did not use. Pls.' Statement ¶ 14; Appx. Ex. E. More importantly, two separate employment counsel each advised

the defendants that they needed to correct their Wage Notices to include the tip credit provisions, but the defendants ignored the advice of both counsel for years. Pls.' Statement ¶¶ 38-47; Appx. Exs. B at 224:25-225:25;  B-6; B-7; B-8; A; C. Defendants also deliberately cut out the tip credit language from the Wage Notice form that defense counsel provided them. Pls.' Statement at 15; Appx. Exs. B, at 7, Exhibit D; B at 224:25-225:24; Appx. Exs. B-6; B-7.

Deliberately ignoring the advice of one's own counsel (much less two of them), as well as the regulation itself, easily clears the bar for "willful" behavior. Pls' Statement ¶¶ 38-46; Appx. Exs. A; B at 224:25-225:24; B-6; B-7; B-8. It is not as though the defendants did not know how to comply with the law; they knew, and simply made a choice to flout it.

## V.   THE CORPORATE DEFENDANTS ARE LIABLE AS THE CLASS MEMBERS' EMPLOYER.

The defendants do not dispute that TLC West, LLC, and TLC Central, LLC[4] are the class members' employers, depending on the region in which the employees worked. Pls' Statement ¶ 78; Appx. Exs. H at 15:22-24; 16:12-17:2; I at 19:24-20:22. However, in addition, the other corporate defendants are also the plaintiffs' employers and also liable for the violations.

In the Second Circuit, legally distinct corporations are jointly liable for employment violations if they are found to be either a "single employer" or a "joint employer" of the class member. A "single employer" situation typically involves multiple corporations under joint control, such as with a parent-subsidiary, under which the various corporations are all considered the employee's employers and jointly and severally liable for the damages to the plaintiffs. *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005). In the "joint employer" relationship, "'there is no single integrated enterprise,'" but instead two functionally

---

[4]     TLC Utica LLC was internally moved into TLC Central LLC in approximately June 2015. Pls.' Statement ¶ 79; Appx. Ex. I at 22:20-23:10. Thus, for the purposes of this argument, "TLC Central" refers to both TLC Central and TLC Utica.

separate companies who each exercise some authority over common employees. *Id.* (quoting *Clinton's Ditch Cooperative Co. NLRB*, 778 F.2d 132, 137 (2d Cir. 1985)). Whether analyzed under the single employer or joint employer standard, defendants are liable to the class members. Although these doctrines have a long history under federal statutes, the single employer doctrine is also used for state law claims, as is the joint employer doctrine. *Brown v. Daikin America, Inc.*, 756 F.3d 219, 226 (2d Cir. 2014); *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 78-79 (2d Cir. 2003); *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996).

**A.    The defendants are liable as the class members' single employer.**

Because the corporate defendants in this case are all under joint control in a parent-subsidiary relationship, the single employer test is the most natural doctrine to determine if the corporate entities are jointly and severally liable for the violations in this case. The single employer test is comprised of four prongs: 1) interrelationship of operations; 2) centralized control of labor relations; 3) common management; and 4) common ownership or financial control. *Cook v. Arrowsmith Shelbourne, Inc.*, 69 F.3d 1235, 1240-41 (2d Cir. 1995). The corporate defendants easily meet the single employer standard.

1.    <u>The defendants exercised centralized control over their stores' labor relations.</u>

Turning first to "centralized control over labor relations—the most important prong of the four-part test," there is no doubt that the defendants exercised centralized control over labor relations. *Brown*, 756 F.3d at 227. Susan Sabio, T.L. Cannon Management Corp.'s Director of Human Resources, testified that she had responsibility over all "[r]ecruiting, employee relations, policies and procedures; anything that deals with our human assets in the company," and that T.L. Cannon Management Corp. "formulate[s] procedures [and] policies" for TLC "West, Central, [and] East." Pls.' Statement ¶¶ 81, 82; Appx. Exs. B at 155:9-25; H at 17:15-17.

Ms. Sabio's testimony was reinforced by Elizabeth Quindoza, the defendants' treasurer and other 30(b)(6) witness, who stated that T.L. Cannon Management Corp. determines the pay rates, employment policies, and wage notices used at its stores. Pls.' Statement ¶ 84; Appx. Ex. I. at 76:11-78:2; *see also* Appx. Ex. G at 110:17-111:18; F at 16:15-17:4 (corporate policies for all T.L. Cannon restaurants are set by T.L. Management Corp.).[5]

Additionally, Ms. Sabio testified that she had "the ability to affect pay practices" at Applebee's, such as the defendants' compliance with "regulations and minimum wage and people are [being] paid when they're supposed to be paid, et cetera." Pls.' Statement ¶ 88; H at 22:5-8. Ms. Sabio further testified that T.L. Cannon Management Corp. compiles and distributes "best demonstrated practices that [T.L. Cannon Management Corp.] recommend[s] the restaurants to follow," and that it distributes the employee wage notices used at its stores. Pls.' Statements ¶ 85; Appx. Ex. B at 158:3-18, 165:7-21. Similarly, Ms. Quindoza testified that T.L. Cannon Management Corp. hires the company that creates the employment applications used by TLC West and TLC Central. Pls.' Statement ¶ 85; Appx. Ex. I at 95:11-22.

Given the defendants' extensive testimony regarding centralized control over labor relations, plaintiffs clearly satisfied the first, and most important, prong of the test.

> 2. The defendants have interrelated operations, common management, common ownership, and common financial control.

Similarly, there is no dispute that the various operations of the corporate defendants are all interrelated, that all the defendants have common management, or that there is common ownership and financial control of the corporate defendants. First, T.L. Cannon holds itself and

---

[5]  *See also E.E.O.C. v. Everdry Mktg. & Mgmt., Inc.*, No. 01-CV-6329CJS, 2005 WL 231056, at *6 (W.D.N.Y. Jan. 31, 2005) (finding triable issues of fact as to single employer status where one defendant handled human resources matters for the other defendant); *Kull v. DAvidoff of Geneva (N.Y.)*, No. 01 CIV. 4831(LMM), 2004 WL 1418088, at *7 (S.D.N.Y. June 23, 2004) (denying the defendants' summary judgment motion where "the entities shared their management functions and used the same human resources departments . . . .").

its subsidiary corporations out as a single integrated enterprise with interrelated operations, common ownership, and common management employing the plaintiffs and class members. T.L. Cannon says on its own website that "T.L. Cannon Companies" includes "TLC West, LLC, TLC Central, LLC, TLC Utica, TLC East, LLC . . . and T.L. Cannon Management Corp. . . ." Pls' Statement ¶ 80; Appx. Ex. I-I.

Second, in their answer to Plaintiffs' First Amended Complaint, the defendants admit that T.L. Cannon Management Corp. centrally manages payroll, accounts payable and financial processing, as well as public relations, customer service, construction, marketing, human resources, benefits, and purchasing for all T.L. Cannon restaurants. Pls.' Statement ¶ 87; Appx. Ex. L, ¶¶ 31, 33. Additionally, Elizabeth Quindoza testified that T.L. Cannon Management Corp. handles the financials for its restaurants by "produc[ing] their monthly P & Ls, income statements, ad hoc reports. We pay the bills, process payroll. Handle any and all audits." Pls' Statement ¶ 88; Appx. Ex. I at 21:17-22. *See also* Appx. Ex. I at 23:16-20, 23:21-24:10.

Third, and further illustrating the defendants' interrelationship of operations and common management, T.L. Cannon Management Corp. institutes employment policies for all of its restaurants. Pls.' Statement ¶ 89; Appx. Exs. G at 110:17-111:18; F at 16:15-17:4 (T.L. Cannon Management Corp. sets corporate policies for all T.L. Cannon restaurants); I at 76:11-78:2 (T.L. Cannon Management Corp. determines the pay rates, employment policies, and wage notices to be used at all of its stores); Pls' Statement ¶ 92; Appx. Ex. I at 95:11-22 (TLC West and TLC Central's employment applications are created by a Company hired by T.L. Cannon Management Corp.). *See also Harris v. New York Times*, No. 90 CIV. 5235 (CSH), 1993 WL 42773, at *12 (S.D.N.Y. Feb. 11, 1993) (refusing to grant the defendants' summary judgment motion as to single employer liability where the subsidiary had "no policies and practices

independent of those generated by the [parent].").

Similarly, T.L. Cannon Management Corp. established company-wide recordkeeping polices and electronically maintained payroll records. Pls.' Statement ¶ 91; Appx. Ex. B at 156:24-157:12, 158:9-21, 159:11-16. 160:2-9. *See also Regan v. In the Heat of the Nite, Inc.*, No. 93 CIV. 862 (KMW), 1995 WL 413249, at *3 (S.D.N.Y. July 12, 1995) (denying the defendants' motion for summary judgment under the single employer doctrine where "employee records, payroll records, and bank deposits of each of the establishments [were] kept together . . . .").

Susan Sabio also testified that the defendants developed tip credit policies that applied to all of their Applebee's restaurants. Pl.'s Statement ¶ 93; H at 42:19-21 ("Under company policy, they are signed in as a server, and everything they're doing is guest-related and would be at the tip credit wage."); H at 116:24-25 (As a matter of company policy, "[a]nybody clocked in as a server was getting tip credit, yes."); H at 132:20-134:5, 103:22-104:15, 131:8-24. *See also* Appx. Ex. H-1 (list of sidework that the defendants paid at tip credit wage on a company-wide policy).

Ms. Sabio further testified that she, as Human Resources Director, had responsibility over all "recruiting, employee relations, policies and procedures, anything that deals with our human assets in the company" and that she had "the ability to affect pay practices" such as the defendants' compliance with "regulations and minimum wage and people are [being] paid when they're supposed to be paid, et cetera." Pls.' Statement ¶ 90; Ex. H at 17:15-17; 22:5-8.

Moreover, all the T.L. Cannon employment policies and practices are overseen by the same president, John Perry, who has the authority to control pay practices and policies for all the restaurants. Pls.' Statement ¶ 94; Appx. Ex. H at 23:4-26:23. The owner of T.L. Cannon Management Corp., Matthew Fairbairn, also has that same authority, and he is "very involved" in running the business. Pls.' Statement ¶ 95; Appx. Ex. H at 26:24-27:2-5.

In fact, it was defendants' centralized management of policies and practices that resulted in the violations at issue in this case. The defendants' failure to comply with the regulations to claim the tip credit by providing compliant wage statements was the result of the defendants' centralized policy that applied to all employees. Pls.' Statement ¶ 96; Appx. Ex. H at 101:17-25 (none of the "employees who were being paid at tip credit" were provided with "a statement with each payment of wages as to the allowances [being] claim[ed] for the tip credit work against the minimum wage"); I at 76:11-78:2. Individual store managers were not making individual decisions about whether to comply with the NYLL's tip credit requirements, these decisions were made centrally by T.L. Cannon Management. Pls.' Statement ¶ 97; Appx. Exs. H at 101:17-25; I at 76:11-78:2. There is no dispute over this fact: the defendants themselves have stipulated that these centralized policies applied to all employees. Pls.' Statement ¶ 98; Appx. Exs. A; J.

Therefore, given that there is no material dispute that the corporate defendants satisfy all four factors of the single-employer test, they are all liable for the violations against the class and the judgment should be entered against them jointly and severally.

**B.      The corporate defendants are alternatively liable as joint employers.**

The single employer test is the most logical test to determine corporate liability in this action given that the corporate defendants are part of a combined corporate relationship. Even if the corporations were viewed, however, as operationally distinct entities, T.L. Cannon Corp. and T.L. Cannon Management Corp. are still jointly and severally liable for damages as they are the class members' joint employer, along with the regional corporate entities.

"Joint employment" does not turn on a rigid or formalistic standard, but rather on whether the defendants jointly employed the plaintiffs, "as a matter of economic reality." This "economic reality" test was developed under the FLSA, but the same test applies under the

NYLL. Joint and several liability can be established by showing that the joint employer (1) had the power to hire and fire the employees, (2) supervised and controlled employees' schedules and terms and conditions of employment, (3) determined the rate and method of payment, or (4) maintained employment records. *Carter v. Duchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984).

However, because this is not a rigid test, these factors are not the only way to establish that two or more defendants acted as joint employers. For example, in *Zheng v. Liberty Apparel Co., Inc.*, 355 F.3d 61, 72 (2d Cir. 2003), the Second Circuit explained that the Court must consider all relevant facts demonstrating that the defendants acted as joint employers, not just the four factors identified in *Carter*. These included: (1) whether the workers used joint employer's premises and equipment, (2) whether the subcontractor had a business that could operate as a unit in conjunction with more than one theoretical joint employer, (3) whether the worker performed a 'discrete line job' that was integral to the joint employer's 'process of production,' (4) whether the subcontractor could transfer its contract to other subcontractors without material changes to the contract, (5) whether the joint employer supervised the work, and (6) whether the workers worked exclusively for the joint employer. Likewise, in the restaurant context, at least one court has applied another set of factors to find that multiple corporations are jointly and severally liable for FLSA violations where they act as a "single employer." *Chen v. TYT East Corp.*, No. 10-cv-5288, 2012 WL 5871617 (S.D.N.Y. Sept. 10, 2013).

### 1.     The *Carter* factors demonstrate the defendants' joint and several liability.

The *Carter* factors include whether the joint employer (1) had the power to hire and fire the employees, (2) supervised and controlled employees' schedules and terms and conditions of employment, (3) determined the rate and method of payment, or (4) maintained employment records. *Carter*, 735 F.2d at 12.

First, there is no dispute that T.L. Cannon Corp. and T.L. Cannon Management Corp. had

some authority to hire and fire employees. Pls.' Statement ¶ 99; Appx. Ex. H at 17:15-17. Further, the president and owners of T.L. Cannon had authority over all aspects of employee relations. The defendants may dispute whether they exercised that authority over specific employees, or only in giving general direction and supervision over employee management, but it is clear that they had the authority to make all decisions involving employees, including the ability to hire and fire. Pls.' Statement ¶ 100; Appx. Exs. I at 80:9-81:19; H at 26:12-15.

As to the second factor, there is no dispute that  T.L. Cannon Corp. and T.L. Cannon Management Corp. controlled the terms and conditions of the class members' employment. Pls.' Statement  ¶ 101; Appx. I at 76:11-78:2 (T.L. Cannon Management Corp. determines the pay rates, employment policies, and wage notices used at all of its stores). Through its centralized human resources department and single Director of Human Resources for all employees, T.L. Cannon Management Corp. centrally supervised and controlled the terms and conditions, including "recruiting, employee relations, policies and procedures, anything that deals with our human assets in the company." Pls.' Statement ¶ 102; Appx. Ex. H at 17:15-17.

Similarly, under the third factor, T.L. Cannon Corp. and T.L. Cannon Management Corp. determined the rate of payment—and particularly the rate of payment and notices for that rate of payment—at issue in this case. The defendants admit in their Amended Answer that T.L. Cannon controlled all payroll centrally. Pls.' Statement ¶ 103; Appx. Ex. L, ¶ 31. Defendants' human resources director testified that she had authority over "people [being] paid when they're supposed to be paid, et cetera." Pls.' Statement ¶ 104; Appx. Ex. H at 22:5-8.

Finally, there is no dispute that T.L. Cannon Management Corp. maintained employment records. Pls.' Statement ¶ 105; Appx. Ex. B at 156:24-157:1-12; 159:11-16; 160:2-9.

Given these undisputed facts, no reasonable jury could fail to find that the defendants

acted as joint employers. The defendants are therefore jointly and severally liable.

2.   The *Zheng* factors demonstrate the defendants' joint and several liability.

The defendants' joint and several liability is further established through the *Zheng* test. The plaintiffs clearly used the defendants' joint premises and equipment while employed at Applebee's.  Further, the defendants' individual stores could only function through the existence of the joint employers. The plaintiffs also performed 'discrete line jobs' that were integral to the joint employers' 'process of production,' since their work constituted an essential step in the defendants' business of customer service. Pls.' Statement ¶ 106; Appx. Ex. I at 71:9-11. Moreover, the plaintiffs' work was tied to the defendants as a whole, as opposed to a specific manager or supervisor at a particular restaurant. Pls.' Statement ¶ 107; App. Ex. I at 69:17-70:24; 74:18-22. As set forth above, the defendants jointly supervised the employees' work. Pls' Statement ¶ 109; Appx. Ex. I at 76:11-78:2, 80:9-81:19. Last, the plaintiffs worked for the defendants and were not borrowed or leased out to other entities. Pls.' Statement ¶ 109; Appx. Exs. I at 70:21-24. Therefore, because the plaintiffs have clearly satisfied the *Zheng* factors, the defendants are jointly and severally liable for all NYLL violations in this case.

## VI.   THE INDIVIDUAL DEFENDANTS ARE LIABLE AS THE CLASS MEMBERS' EMPLOYER.

In addition, the individual defendants—the President and owners of T.L. Cannon—are also jointly and severally liable, because they possessed operational control over the business.

Consistent with the broad definitions and remedial purpose explained above, the Second Circuit has expressly held that "in the individual-liability context," "the remedial nature . . . . warrants an expansive interpretation of its provisions so that they have the widest possible impact in the national economy." *Irizarry v. Castimatidis,* 722 F.3d 99, 109 (2d Cir. 2013) (internal citation omitted). Further, the question of whether a defendant is an employer is "a

-29-

flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances." *Id.* at 104 (internal citation omitted). The standard for individual liability is that an individual officer of a corporation is an employer whenever he possesses "operational control" over the corporation's employment of its employees. *Id.* at 109.

The Second Circuit has held that "operational control" means simply that the individual's "role within the company, and the decisions it entails" has a measurable effect on "the nature or conditions of the employee's employment." *Id.* at 110. Individual liability can be established by "evidence showing his authority over management, supervision, and oversight of [the defendants'] affair's in general," as well as evidence demonstrating that the individual had authority over (1) hiring and firing, (2) employee work schedules or conditions of employment; (3) determining the rate and method of payment, or (4) maintaining employment records. *Id.* at 105 (citing *Barfield v. N.Y.C. Health and Hosps. Corp.,* 537 F.3d 132, 142 (2d Cir. 2008)). The factors are non-exhaustive, and failure to establish any particular factor does not preclude a finding of individual liability. *See id.* at 111-17 (affirming individual liability where only two of the *Carter* factors were satisfied). Further, each factor need not be satisfied in order to find liability given the "flexible" totality of the circumstances concept. *Id.* at 111.

Significantly, the Court expressly held that this standard "does not mean that an individual 'employer' must be responsible for managing plaintiff employees-or indeed, that he or she must have come in contact with the plaintiffs, their workplaces or their schedules." *Id.* at 110. Nor, does it require direct involvement in the specific violations that are alleged. *Id.* at 116.

In *Irizarry,*[6] the Court held the individual defendant was liable as an employer because he had operational control of the business. In reaching its holding, the Court considered a variety of

---

[6]     While the Court's analysis in *Irizarry* regarding individual defendants' liability was under the FLSA, the NYLL is governed by similar definitions. *See Zheng v. Liberty Apparel Co., Inc.,* 355 F.3d 61, 78 (2nd Cir. 2003).

factors including that: (1) the individual defendant was a chairman, president and CEO of the business; (2) he was responsible for a variety of issues, including banking, real estate, financials, merchandising, governmental issues and vendor relationships; (3) the person responsible for daily operations, and in the stores on a regular basis, reported to the COO and rarely spoke with the individual defendant; (4) he stayed apprised of the overall business by reviewing overall profit and loss statements as well as purchase statements: (5) he focused on "big picture" decisions and made "ultimate decisions" as to how the company was run; (6) there was no evidence that he was responsible for the violations; (7) he hired managerial employees; and (8) he had authority to hire and fire, but did not get involved in decisions like that. Because the individual defendant had operational control, he was held liable as an employer.

Defendant David Stein had operational control over defendants' businesses as co-founder of the company. Pls.' Statement ¶ 110; Appx. Ex. H at 15:20-16:7. Like *Irizarry,* defendants' 30(b)(6) witness confirmed that since the inception of the company Mr. Stein had oversight over the companies' affairs as the chairman of TLC Cannon Corp, TL Management Corp., TLC Central, and TLC West. Pls.' Statement ¶ 111; Appx. Exs. I at 27:8-11, 31:21-25, 39:24-40:7, 56:11-13, 56:20-57:24; F at 16:2-4. For instance, as an officer, Stein made decisions about distributions of profits. Pls.' Statement ¶ 112; Appx. Ex. I at 58:19-59:7, 48:15-22. Further, at times, Stein attended senior staff meetings. Pls.' Statement ¶113; Appx. Ex. H at 29:19-23. During those meetings, Ms. Sabio testified that "[i]t's a business review with all the functional areas." Pls.' Statement ¶ 114; Appx. Ex. H at 30:8-9. Defendants' 30(b)(6) witness also testified that at senior staff meetings, projects and financial results for all TLC companies were presented. Pls.' Statement ¶ 116; Appx. Ex. I at 52:19-53:4. In addition, Defendant Stein was a shareholder as well. Pls.' Statement ¶ 117; Appx. Ex. I at 89:9-11, 24:18-25:8, 39:4-12, 54:16-19.

Also similar to the defendant in *Irizarry,* defendant Matthew Fairbairn had operational control over the business through a variety of his roles within the companies. For instance, defendant Fairbairn was co-founder and president of TLC Cannon Corp. and T.L.Management Corp. Pls.' Statement ¶118; Appx. Exs. I at 15:20-16:7, 28:8-11, 31:21-32:5; H at 23:13-14; F at 11:6-23. Further, defendant Fairbairn was also the CEO of TLC West and TLC Central. Pls.' Statement ¶ 119; Appx. Exs. I at 39:24-40:9, 56:11-24; F at 7:18-21. Mr. Fairbairn is also a shareholder of T.L. Cannon Corp., T.L. Cannon Management Corp., TLC Central, and TLC West. Pls.' Statement ¶ 120; Appx. Ex. I at 24:18-22, 25:10-14, 31:9-12, 39:4-12, 54:16-20. Like *Irizarry,* in his capacity as president, Fairbairn managed other high level employees, including determining the compensation for Ritch Mabry and John Perry. Pls.' Statement ¶ 121; Appx. Ex. I at 47:18-25; H at 58:6-8; F at 30:15-20, 32:13-21. Further, like *Irizarry,* Fairbairn was involved in the financial decisions of the company. For instance, as an officer of TLC West and TLC Central, he was involved in determining the distributions made to shareholders. Pls.' Statement ¶ 122; Appx. Ex. I  at 48:15-25, 58:19-59:7. Defendant Fairbairn, similar to *Irizarry,* was also actively involved in the defendants' affairs. For example, Mr. Fairbairn visited the restaurants. Pls.' Statement ¶ 123; Appx. Ex. I at 85:15-17; F at 21:11-25, 22:5-26. In addition to attending leadership staff meetings, Fairbairn also attended the senior staff meetings where all "projects and financial results for all TLC Companies" were presented. Pls.' Statement ¶ 124; Appx. Ex. I at 51:8-53:4; 50:18-25; G at 58:15-60:13. Defendant Fairbairn also reviewed "Profit and Loss Statements for the company" which included payroll related information on salary and wages, and also received financial and accounting reports. Pls.' Statement ¶ 125; Appx. Exs. I at 83:12-84:2; F at 20:4-21:10. Further, like *Irizarry,* defendants' 30(b)(6) witness testified that Fairbairn has hiring and firing authority over employees. Pls.' Statement ¶ 126; Appx. Ex. I at 85:7-14.

Additionally, Fairbairn is involved in the "big picture" running of the company like in *Irizarry;* defendants' 30(b)(6) witness testified "he is very involved" in the running of the company. Pls.' Statement ¶ 127; Appx. Ex. H at 27:10-24; F at 14:18-16:9, 17:13-20, 15:2-3. Indeed, Fairbairn has authority over budgeted amounts for the company. Pls.' Statement ¶ 128; Appx. Ex. F at 17:5-20; I at 84:3-85:6. Further, along with Perry, Fairbairn sets goals for the overall business for the year. Pls.' Statement ¶ 129; Appx. Ex. G at 14:18-16:2. However, Fairbairn was also involved with the policies and practices of the company, including the employment and labor regulations. Pls.' Statement ¶ 130; Appx. Ex. H at 27:14-16; F at 17-20, 37:22-38:8, 46-55, 56:16-59:22; G at 99:15-106:9, 18:7-37; *see also* G-1; G-2; F-2; F-3; F-5. In fact, defendants' Director of Human Resources testified that Perry, with approval of Fairbairn, gave her the ability to control all aspects of the defendants' employment of the plaintiffs and class members. Pls.' Statement ¶ 131; Appx. Ex. H at 17:15-17, 23:4-27:5, 23:15-18. She also testified that the Fairbairn (and Perry) had the authority to direct her to change any aspect of the defendants' policies that affected the employment of the plaintiffs and class members. Pls.' Statement ¶ 132; Appx. Ex. H at 24:20-21; 27:4-5. *See also* Appx. Ex. F at 19:22-20:3 (Fairbairn testified that he had final authority over any decision).

As the president of T.L. Cannon Management Corp., TLC West, TLC Central and TLC East, John Perry also had operational control over the businesses. Pls.' Statement ¶ 133; Appx. Exs. I at 36:3-6, 39:24-40:13, 56:11-17; G at 8:21-25. Further, Perry was a shareholder of TLC West and TLC Central. Pls.' Statement ¶ 134; Appx. Ex. I at 39:4-12; 54:16-22; G at 52:6-20. Similar to *Irizarry,* Perry was actively involved in the day-to-day operations of the businesses, including managing the construction department, IT department, and human resources department. Pls.' Statement ¶ 135; Appx. Exs. I at 78:19-79:4; H at 28:19-21; G at 14:2-9, 65:21-

66:6, 75:3-7, 36:10-37:20; G-3; F-1; F-2; F-3, F-4; F-5. Perry's role included monitoring wage and hour compliance, including the company's compliance of the tip credit guidelines with human resources. Pls.' Statement ¶ 136; Appx. Ex. G at 18:7-37, 38:11-43:5, 99:15-106:9; 36:10-37:20; G-1; G-2. In fact, the Director of Human Resources, Susan Sabio, reported directly to Perry, and they interacted on a regular basis.  Pls.' Statement ¶ 138; Appx. Exs. I. at 78:3-11; H at 28:19-21; G at 43:10-17; F at 44:9-13. Testifying as the defendants' 30(b)(6) witness, Sabio testified that she had the ability to control all aspects of the defendants' employment of the plaintiffs and class members, and such authority was given to her by Perry. Pls.' Statement ¶ 139; Appx. Ex. H at 17:15-17, 23:4-26:23. In addition, Sabio testified that the Perry had the authority to direct her to change any aspect of the defendants' policies that affected the employment of the plaintiffs and class members. Pls.' Statement ¶ 140; Appx. Ex. H. at 24:20; 27:4-5, 79:10-23, 22:13-23:3, 24:4-21, 26:12-15. Perry is also involved in the approval of the company's best practices procedures. Pls.' Statement ¶ 141; Appx. Ex. B at 162:9-169:20; B-1. Further, Perry visited the store locations, and like *Irizarry,* provided suggestions on how to run the stores. Pls.' Statement ¶ 142; Appx. Ex. I at 81:4-19; G at 46:17:24, 50:5-51:16 (Perry testified as to the type of suggestions or feedback he provided at the stores, including identifying additional training of staff that was needed). Perry also had the authority to hire, fire and discipline employees. Pls.' Statement ¶ 143; Appx. Ex. I at 80:9-81:16; H at 32-36:7.

Defendant Perry, like in *Irizarry,* stayed apprised of the overall business affairs.  For example, Perry attended staff leadership meetings, department head meetings, and director of operations meetings, as well as senior staff meetings where projects and financial results of all TLC Companies are discussed. Pls.' Statement ¶ 144; Appx. Ex. I at 50:18-25, 52:19-53:4; G at 58:15-60:13, 62:10-18. Perry also reviewed sales performance and operations metrics. Pls.'

-34-

Statement ¶ 145; Appx.. G at 53:7-55:10. Further, Perry had authority over budgeted amounts for the company, as well as developing the bonus plan. Pls.' Statement ¶ 146; Appx. Ex. I. at 84:3-21; G at 93:17-94:14, 106:18-108:11. Perry sets goals for the overall business for the year. Pls.' Statement ¶ 148; Appx. Ex. G at 14:18-16:2. Also, he was involved in determining the distributions to shareholders. Pls.' Statement ¶ 149; Appx. Ex. I at 48:15-22; 58:19-59:7.

Given that such facts are not disputed, no reasonable jury could fail to find that these defendants did not have operational control over the defendants' restaurant operations. They are therefore jointly and severally liable for all NYLL violations at issue in this case.

## VII.  LANGUAGE FOR THE JUDGMENT REQUIRED IN ORDER UNDER THE LABOR LAW.

Pursuant to Labor Law § 663(4), "Any judgment or court order awarding remedies under this section shall provide that if any amounts remain unpaid upon the expiration of ninety days following issuance of judgment, or ninety days after expiration of the time to appeal and no appeal therefrom is then pending, whichever is later, the total amount of judgment shall automatically increase by fifteen percent." Therefore, the class requests inclusion of this provision in any order granting relief.

### CONCLUSION

For all the foregoing reasons, plaintiffs respectfully ask that the Court grant their motion and issue an order holding the defendants liable to Subclass B as to the Wage Notice Claim and liable to Subclass A as to the Pay Statement Claim, and awarding damages to the class for the difference between what the defendants paid and the minimum wage in effect at the time such hours were worked, as calculated in the Affirmation of Dr. Audrius Girnius.

Dated: September 22, 2016

                                   **THOMAS & SOLOMON LLP**

By:     /s/ J. Nelson Thomas
            J. Nelson Thomas, Esq.
            Michael J. Lingle, Esq.
            Jessica L. Lukasiewicz, Esq.
            *Attorneys for Plaintiffs*
            693 East Avenue
            Rochester, New York 14607
            Telephone:  (585) 272-0540
            nthomas@theemploymentattorneys.com
            mlingle@theemploymentattorneys.com
            jlukasiewicz@theemploymentattorneys.com